```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF MISSOURI
                          EASTERN DIVISION


ARMOD LEMANS HINKLE,              )
                                  )
            Plaintiff,            )
                                  )
       v.                         )     No. 4:11 CV 1667 DDN
                                  )
ST. LOUIS POST DISPATCH, et al.,  )
                                  )
            Defendants.           )
```

## MEMORANDUM

This action is before the court on the unopposed motion of defendants St. Louis Post Dispatch, www.stltoday.com, Lee Enterprises, and Matthew Hathaway for summary judgment. (Doc. 8.) The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Doc. 19.)

## I. BACKGROUND

On September 23, 2011, plaintiff Armond Lemans Hinkle, proceeding pro se, commenced this action against defendants St. Louis Post Dispatch, www.stltoday.com, Lee Enterprises, and Matthew Hathaway (collectively "defendants"), alleging that on September 23, 2009, defendants knowingly and/or recklessly published a false, libelous, malicious, and fraudulent article concerning his handling of investors' money.[1] (Doc. 1.) Specifically, plaintiff identifies three statements as the basis for his claim:

(1) "The Hinkles allegedly raised more than $315,000, but did not use the money to start the business";

---

[1] In his complaint, plaintiff asserts that the court has subject matter jurisdiction over this action under 28 U.S.C. § 1391(a)(1). § 1391, however, directs the proper venue in which a civil action may be commenced; § 1391 is not a basis for subject matter jurisdiction. Construing plaintiff's pro se complaint broadly, the court determines that it has subject matter jurisdiction over the action pursuant to 28 U.S.C. § 1332 because according to the complaint, plaintiff is a resident of South Carolina, all defendants are residents of Missouri, and plaintiff seeks more than $75,000 in damages, exclusive of interest and costs. (Doc. 1.)

(2) "Additionally, the Hinkles failed to provide Securities Division investigators with any information showing that steps were taken to purchase inventory, licensing agreements, or client prospects"; and

(3) ". . . and spending $178,000 of their investors' money on personal expenses."

(Id. (omission in original).)

Plaintiff alleges that the article was read by millions of people, hundreds of whom plaintiff knows, and that defendants would have learned of the falsity of the facts asserted in the article had defendants used reasonable due diligence to check the veracity of the information. (Id.) Plaintiff alleges that he has suffered loss of reputation, shame, and injury to his feelings, and that he is no longer able to attain employment or pay bills. (Id.) Plaintiff seeks compensatory damages, punitive damages, interest, and costs. (Id.)

On October 24, 2011, defendants filed their motion for summary judgment and related documents. (Docs. 8-12.) On November 3, 2011, the court gave plaintiff until December 5, 2011 to file a written response to defendants' motion for summary judgment. (Doc. 17.) Plaintiff has filed no response to the motion for summary judgment.

## II. MOTION FOR SUMMARY JUDGMENT

Defendants argue in their motion for summary judgment that they are entitled to protection under the fair report privilege because the challenged statements from the article were direct quotations from an official press release issued by the Missouri Office of Secretary of State on September 23, 2009 following a cease and desist order by the Commissioner of the Securities Division of the Missouri Office of Secretary of State ("Commissioner"). Defendants also argue that plaintiff Hinkle is estopped from challenging the veracity of the complained-of statements because these statements were found to be true in a judgment on the merits by the Commissioner. (Docs. 8, 10.)

Plaintiff Hinkle has had a reasonable opportunity to respond to the motion for summary judgment, but has not done so. Therefore, defendants'

submitted statement of undisputed facts is deemed admitted by plaintiff Hinkle for the purposes of the motion. See E.D.Mo. Local Rule 7-401(E).

### III.  STATEMENT OF UNDISPUTED FACTS

#### September 22, 2009 Order

On September 22, 2009, Matthew D. Kitzi, Commissioner of Securities for the Missouri Office of Secretary of State, issued an Order to Cease and Desist and Order to Show Cause Why Civil Penalties and Costs Should Not Be Imposed ("Cease and Desist Order") against plaintiff and his mother, Gina M. Hinkle. (Doc. 9 at ¶ 3.) According to the Cease and Desist Order, on September 3, 2009, the Enforcement Section of the Securities Division of the Office of Secretary of State ("Securities Division"), through its Chief Enforcement Counsel, Nathan Soenerk, had filed a petition seeking the Cease and Desist Order. (Doc. 9-1, Ex. A.)

In the Cease and Desist Order, the Commissioner made 38 findings of fact. (Doc. 9-1, Ex. A at ¶¶ 1-38.) The Commissioner found that plaintiff was the Senior Vice President and Chief Operating Officer of Direcutec and that plaintiff's mother was the President and Chief Executive Officer of Direcutec. (Id. at ¶¶ 2, 3.) Direcutec was in the business of developing, marketing, and selling handheld hardware devices and software products to the law enforcement, health care, and restaurant services industries. (Id. at ¶ 5.) From May, 2006 to February, 2007, plaintiff and his mother sold "membership units" to at least 14 investors, which generated at least $315,000. (Id. at ¶¶ 6, 7.) These "membership units" were not registered under the Missouri Securities Act of 2003, nor had the Hinkles registered to sell securities in Missouri or filed notice that the "membership units" were federal securities. (Id. at ¶ 8.)

The Commissioner also found that information obtained during the Securities Division's investigation showed that at least $315,000 in investor funds were placed in four bank accounts at The Private Bank. (Id. at ¶ 32.) An analysis of The Private Bank's records indicated that at least $178,000 of investor funds was spent by plaintiff and his mother on expenses unrelated to Direcutec's purported business, including a mortgage payment on plaintiff's mothers private residence, Avon products,

personal insurance, and unaccounted for cash withdrawals. (Id. at ¶ 33.) Despite telling investors that Direcutec would sell hardware and software products to third parties, plaintiff and his mother failed to provide investors with any information showing that steps were taken to procure inventory, licensing agreements, or client prospects. (Id. at ¶ 37.) In statements to the Securities Division, plaintiff and his mother admitted that Direcutec funds were used for their personal expenses and that they did not disclose this use to investors. (Id. at ¶ 38.)

Based on these findings, the Commissioner concluded that plaintiff and his mother had committed multiple violations of: offering or selling an unregistered security, in violation of Mo. Rev. Stat. § 409.3-301; transacting business as an unregistered agent, in violation of Mo. Rev. Stat. § 409.4-402(a); making an untrue statement of a material fact in connection with the sale of a security, in violation of Mo. Rev. Stat. § 409.5-501(2); omitting to state a material fact in connection with the sale of a security, in violation of Mo. Rev. Stat. § 409.5-501(2); and employing a device, scheme, or artifice to defraud, in violation of Mo. Rev. Stat. § 409.5-501(1). (Id. at ¶¶ 51-74.)

Based on these findings of fact and conclusions of law, the Commissioner ordered plaintiff and his mother to refrain from violating Missouri law by selling unregistered securities, selling securities as an unregistered agent, or making false or misleading statements in the connection of the sale of securities. (Id. at 9-10.) The Commissioner left open his determination of whether to grant the Securities Department's petitions for civil penalties and costs against plaintiff and his mother. (Id. at 10.)

Plaintiff and his mother were notified that they could request a hearing before the Commissioner within 30 days of receiving the Cease and Desist Order. (Id. at 12.) Any such hearing would occur within 15 days after receipt of the request. (Id.)

### September 23, 2009 Press Release

On September 23, 2009, Missouri Secretary of State Robin Carnahan issued an official press release detailing the Cease and Desist Order. (Doc. 9 at ¶ 5; Doc. 9-2, Ex. B.) The press release, titled "Carnahan

Halts St. Louis Investment Scheme Operated by Mother and Son," detailed the findings, conclusions, and orders in the Commissioner's Cease and Desist Order. (Doc. 9-2, Ex. B.) The press release included the following three statements:

(a) Secretary of State Robin Carnahan today announced officials in her office issued a Cease and Desist Order against a St. Louis pair, Armod L. Hinkle and his mother, Gina M. Hinkle, for selling unregistered investments and spending $178,000 of their investors' money on personal expenses.

(b) The Hinkles allegedly raised more than $315,000, but did not use the money to start the business.

and

(c) Additionally, the Hinkles failed to provide Securities Division investigators with any information showing that steps were taken to purchase inventory, licensing agreements, or client prospects.

(Id.) The press release also quoted Missouri Secretary of State Robin Carnahan as saying, "[i]nvestors should be extremely cautious if promised unusually high returns" and that "[b]efore you invest, one call to the Investor Protection Hotline can help protect your savings." (Id.)

### September 23, 2009 Article

On September 23, 2009, defendants wrote and published an article on www.stltoday.com.[2] (Doc. 9 at ¶ 1.) Among the statements made in the article were:

(a) The Hinkles allegedly raised more than $315,000, but did not use the money to start the business.

(b) Additionally, the Hinkles failed to provide Securities Division investigators with any information showing that steps were taken to purchase inventory, licensing agreements, or client prospects.

and

---

[2]In their statement of undisputed facts, defendants state only that plaintiff alleges that on September 23, 2009, defendants published an article containing the challenged statements. (Doc. 9 at ¶ 1.) For purposes of the instant motion for summary judgment, the court considers these facts of publication as undisputed.

(c)   ... and spending $178,000 of their investigators' money on personal expenses.

(Doc. 9 at ¶ 2 (ellipses in original).)

### February 15, 2011 Hearing

On October 26, 2009, plaintiff requested a hearing regarding the Cease and Desist Order. (Doc. 9 at ¶ 8; Doc. 9-3, Ex. C at ¶ 3.) After plaintiff was given due and proper notice, the requested hearing on the September Order was held on February 15, 2011. (Doc. 9 at ¶ 8; Doc. 9-3, Ex. C at ¶ 4.) Neither plaintiff nor plaintiff's counsel appeared or requested a continuance. (Doc. 9 at ¶ 8; Doc. 9-3, Ex. C at ¶ 4.)

### June 29, 2011 Final Order

On June 29, 2011, the Commissioner issued a Final Order to Cease and Desist and Order Imposing Civil Penalties and Awarding Costs to Respondent Armod Hinkle ("Final Order"). (Doc. 9 at ¶ 10; Doc. 9-3, Ex. C.) The Final Order adopted and incorporated substantially all of the findings of fact and conclusions of law from the Cease and Desist Order. (Doc. 9-3, Ex. C at ¶¶ 12, 13.) The Final Order also ordered plaintiff to pay a total of $24,215 in civil penalties and costs. (Doc. 9-3, Ex. C at 3.)

### **IV.  MOTION FOR SUMMARY JUDGMENT STANDARD**

Summary judgment must be granted when the pleadings and proffer of evidence demonstrate that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Devin v. Schwan's Home Serv., Inc., 491 F.3d 778, 785 (8th Cir. 2007). The court must view the evidence in the light most favorable to the nonmoving party and accord it the benefit of all reasonable inferences. Devin, 491 F.3d at 785. A fact is "material" if it could affect the ultimate disposition of the case, and a factual dispute is "genuine" if there is substantial evidence to support a reasonable jury verdict in favor of the nonmoving party. Die-Cutting Diversified, Inc. v. United Nat'l Ins. Co., 353 F. Supp. 2d 1053, 1054-55 (E.D. Mo. 2004).

Initially, the moving party must demonstrate the absence of an issue for trial. Celotex, 477 U.S. at 323. Once a motion is properly made and supported, the nonmoving party may not rest upon the allegations in its pleadings or general denials of the movant's assertions, but must instead proffer admissible evidence that demonstrates a genuine issue of material fact. Fed. R. Civ. P. 56(e); Howard v. Columbia Pub. Sch. Dist., 363 F.3d 797, 800 (8th Cir. 2004); Krein v. DBA Corp., 327 F.3d 723, 726 (8th Cir. 2003); Essex Ins. Co. v. Stone, No. 1:09 cv 1 SNLJ, 2010 WL 330328, at *2 (E.D. Mo. Jan. 21, 2010). Plaintiff has not responded to the motion for summary judgment.

## V. DISCUSSION

Defendants argue they are entitled to summary judgment because they are protected by the fair report privilege and because plaintiff Hinkle should be collaterally estopped from claiming the complained-of statements in the article are false.

### A. Fair Report Privilege

Under Missouri law, "[r]eports of legislative, judicial or executive proceedings and the statements made therein, are subject to a qualified privilege." Kenney v. Scripps Howard Broad. Co., 259 F.3d 922, 923 (8th Cir. 2001). This privilege exists to enable the press to publish accounts of governmental proceedings or reports containing defamatory statements without being exposed to liability. Mitan v. Osborn, No. 10-3207-CV-S-SWH, 2011 WL 4352550, at *4 (W.D. Mo. Sept. 16, 2011). "The basis of this privilege is the interest of the public in having information made available to it as to what occurs in official proceedings and public meetings." Restatement (Second) of Torts § 611 cmt. a (1977).

Missouri courts have adopted this privilege, known as the fair report privilege, as set forth in Restatement (Second) of Torts § 611 (1977):

> The publication of defamatory matter concerning another in a report of an official action or proceeding or of a meeting open to the public that deals with a matter of public concern is privileged if the report is accurate and complete or a fair abridgment of the occurrence reported.

Shafer v. Lamar Publ'g Co., 621 S.W.2d 709, 711 (Mo. Ct. App. 1981) (adopting and quoting Restatement (Second) of Torts § 611 (1977)). Thus, the privilege is limited to matters of public concern stated in a report of an official action or proceeding or a public meeting. To be entitled to protection, the publication must be a fair and accurate report or abridgment of the proceedings. Kenney, 259 F.3d at 923-24. Whether a defendant is entitled to protection under the fair report privilege is a question of law for the court. Id. at 924.

The first inquiry is whether the subject matter reported by defendants was a matter of public concern. Here, the article reported on a matter of public concern: warning potential investors of a potentially fraudulent investment scheme. According to the press release, plaintiff and his mother had sold unregistered investments and had spent investors' money on their own personal expenses rather than on the purported business. (Doc. 9-2, Ex. B.) Missouri Secretary of State Robin Carnahan cautioned potential investors to call the Investor Protection Hotline before investing with companies or individuals promising unusually high returns. (Id.) There is no proffered evidence that the article was published for any purpose other than conveying the warning of Missouri Secretary of State Robin Carnahan, which was founded on the findings and conclusions of the Commissioner, to the public. Therefore, the subject matter of the article was a matter of public concern for purposes of the fair report privilege.

The second issue is whether the article reflected the report of an official action. Here, the article relied on Missouri Secretary of State Robin Carnahan's press release, which cautioned the public about a possible fraudulent investment scheme. A publication relying on an official governmental news release may be entitled to qualified protection under the fair report privilege. See, e.g., Alsop v. Cincinnati Post, 24 F. App'x 296, 297-98 (6th Cir. 2001) (per curiam) (holding the newspaper was entitled to rely upon a press release issued by the United States Attorney); Stewart v. NYT Broad. Holdings, 240 P.3d 722, 724-25 (Okla. Ct. App. 2010) (holding the media outlet was entitled to rely upon the police department's press release and press conference); Conterras v. Vill. of Woodridge, No. 93 C 7727, 1994 WL 174092, at *3

(N.D. Ill. May 5, 1994) (holding the newspaper was entitled to rely upon the police department's press release). Because the press release was an official report issued by the Missouri Secretary of State discussing the actions of the Missouri Securities Division and findings and conclusions of the Commissioner, the press release was a report of an official action upon which defendants could rely and receive qualified protection under the fair report privilege. See Lami v. Pulitzer Publ'g Co., 723 S.W.2d 458, 458-60 (Mo. Ct. App. 1986) (holding the newspaper was entitled to rely on a public computer printout report of the Missouri Department of Revenue).

The third issue is whether the article was a fair and accurate report or abridgment of the press release. To be accurate, the publication need not be "exact in every immaterial detail" or "conform to that precision demanded in technical or scientific reporting," but must convey "a substantially correct account of the proceedings" to the reader. Restatement (Second) of Torts § 611 cmt. f (1977). To be fair, the publication cannot edit a report so as "to convey an erroneous impression to those who hear or read it." Id. Here, the complained-of statements were taken almost verbatim from the press release, and the minor differences were not substantive. Compare (Doc. 1) with (Doc. 9-2, Ex. B). The article was a fair and accurate abridgment of the press release, and thus entitled to protection under the fair report privilege.

Therefore, defendants are entitled to qualified immunity under the fair report privilege. Because summary judgment is appropriate on this basis, the court need not determine whether plaintiff is collaterally estopped from challenging the truthfulness of the complained-of statements.

## VI. CONCLUSION

For the reasons stated above, the motion of defendants St. Louis Post Dispatch, www.stltoday.com, Lee Enterprises, and Matthew Hathaway for summary judgment (Doc. 8) is sustained.

An appropriate judgement order is issued herewith.


    /S/   David D. Noce
**UNITED STATES MAGISTRATE JUDGE**

Signed on December 19, 2011.